UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HUANKE SUN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | |
| CHEETAH MOBILE INC., SHENG FU, KA WAI ANDY YEUNG, YUK KEUNG NG, and VINCENT ZHENYU JIANG, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Huanke Sun ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cheetah Mobile Inc. ("Cheetah" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Cheetah securities between April 21, 2015 and November 27, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Cheetah is a mobile Internet company with global market coverage. It has attracted hundreds of millions of monthly active users through its mobile utility products such as Clean Master and Cheetah Keyboard, casual games such as Piano Tiles 2, Bricks n Balls, and the live streaming product LiveMe.

3.     The Company provides its advertising customers, which include direct advertisers and mobile advertising networks through which advertisers place their advertisements, with direct access to highly targeted mobile users and global promotional channels. The Company also provides value-added services to its mobile application users through the sale of in-app virtual items on selected mobile products and games.

4.     The Company was formerly known as Kingsoft Internet Software Holdings Limited and changed its name to Cheetah Mobile Inc. in March 2014. Cheetah was incorporated in 2009 and is headquartered in Beijing, People's Republic of China.

5.     Cheetah's apps have been downloaded over 2 billion times since they were launched beginning in September 2011. For example, Cheetah's app Clean Master was launched in September 2012 and has since been downloaded 1 billion times. Several of the Company's apps are among the most popular productivity apps in the entire Google Play store.

6.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cheetah's apps had undisclosed imbedded features which tracked when users downloaded new apps; (ii) Cheetah used this data to inappropriately claim credit for having caused the downloads; (iii) the foregoing features, when discovered, would foreseeably subject the Company's apps to removal from the Google Play store; (iv) accordingly, Cheetah's Class Period revenues were in part the product of improper conduct and thus unsustainable; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.    On November 26, 2018, *BuzzFeed News* reported that certain Cheetah apps then available in the Google Play store were exploiting user permissions as part of an ad fraud scheme. The *BuzzFeed News* article stated that Cheetah's apps "tracked when users downloaded new apps and used this data to inappropriately claim credit for having caused the download." *BuzzFeed News* reported that two of Cheetah's apps were removed from the Google Play store after publication of the article.

8.    On this news, Cheetah's American depositary receipt ("ADR") price fell $3.32, or nearly 37%, over the next two trading sessions, closing at $5.48 on November 27, 2018.

9.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Cheetah securities are traded on the New York Stock Exchange ("NYSE"), located within this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Cheetah securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Cheetah is a Chinese corporation with its principal executive offices located at Building No. 8, Hui Tong Times Square Yaojiayuan South Road, Beijing 100123, China. Cheetah's ADRs trade in an efficient market on NYSE under the ticker symbol "CMCM".

16.     Defendant Sheng Fu ("Fu") has served at all relevant times as the Chief Executive Officer of Cheetah.

17.     Defendant Ka Wai Andy Yeung ("Yeung") served as the Chief Financial Officer from January 2014 until his resignation in March 2017.

18.     Defendant Vincent Zhenyu Jiang ("Jiang") has served as the Principal Financial Officer of Cheetah since April 10, 2017.

19.     Defendant Yuk Keung Ng ("Ng") served as the interim Principal Financial Officer of Cheetah from April 1, 2017 to April 10, 2017

20.     The Defendants referenced above in ¶¶ 16-19 are sometimes referred to herein collectively as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Cheetah is a mobile Internet company with global market coverage. It has attracted hundreds of millions of monthly active users through its mobile utility products such

as Clean Master and Cheetah Keyboard, casual games such as Piano Tiles 2, Bricks n Balls, and the live streaming product LiveMe.

23.    Cheetah's mobile apps are available for download through, *inter alia*, Google Play, a digital distribution service operated and developed by Google Inc. ("Google"). Google Play serves as the official app store for Google's Android operating system, allowing users to browse and download applications developed with the Android software development kit ("SDK") and published through Google.

24.    Cheetah provides its advertising customers, which include direct advertisers and mobile advertising networks through which advertisers place their advertisements, with direct access to highly targeted mobile users and global promotional channels. The Company also provides value-added services to its mobile application users through the sale of in-app virtual items on selected mobile products and games.

**Materially False and Misleading Statements Issued During the Class Period**

25.    The Class Period begins on April 21, 2015, when the Company filed its annual report on Form 20-F for the period ended December 31, 2014 (the "2014 20-F"), which contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fu and Yeung, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.    In the 2014 20-F, the Company reported total revenue of $284.2 million in 2014, approximately 75% of which it attributed to "online marketing services". The Company described its online marketing services business in the 2014 20-F, stating in relevant part:

> Revenues from our online marketing services accounted for 73.8%, 81.7% and 75.0% of our revenues in 2012, 2013 and 2014, respectively. ***We generate online***

*marketing revenues primarily by referring user traffic and selling advertisements on our mobile and PC platforms.* The fee arrangements generally include cost per sale, cost per click, cost per time or cost per installation for actions that originate from our platform. We believe that the most significant factors affecting revenues from online marketing include:

- *User base and user engagement.* We believe a large, loyal and engaged user base would help us retain existing customers and attract more customers seeking online marketing services and at the same time gives us more pricing power. It also results in more user impressions, clicks, sales or other actions that generate more fees for performance-based marketing. In particular, a large and engaged mobile user base is crucial for the long-term growth of our online marketing services. We plan to increase our spending on marketing activities to further grow our global mobile user base.

- *Revenue sharing and fee arrangements with our significant customers.* A small number of customers have contributed a majority of our online marketing service revenues. Changes in the revenue sharing or fee arrangements with these significant customers may materially affect our online marketing services revenues. For example, changes from pay per click to pay per sale arrangements may result in a smaller percentage of revenue-generating traffic. Likewise, changes in the fee rate we receive per click or per sale may affect our online marketing services revenues. Although changes in the revenue sharing and fee arrangements with our individual customer may affect our revenues positively or negatively, our array of choices helps to increase our overall customer base and our ability to tailor fee arrangements to the needs of our customers.

- *Ability to increase the number of customers.* We had over 950 customers in 2014, including business partners such as Facebook and Google. Our ability to increase our number of customers depends on whether we can provide integrated marketing services and help the customers more precisely reach their targeted audience, the effectiveness of our direct sales efforts, our ability to successfully acquire additional customer base through acquisition of complementary businesses, and our ability to increase our range of cooperation with existing business partners such as Facebook and Google.

- *Optimal utilization of advertising inventory.* Certain categories of customers are willing to offer higher rates for our online marketing services due to the high return on investment they can achieve on our platform. Our ability to source high quality customers within the appropriate categories that our users are interested in and our ability to optimize the allocation of our advertising inventory to these customers can help improve our online marketing services revenues.

(Emphasis added.)

27.    The Company acknowledged the importance of the Google Play store as a means of distribution for its apps, but presented merely a generic, boilerplate warning to the effect that "*[i]f* Google Play . . . terminate[s] their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected." (Emphasis added.)

28.    The 2014 20-F further discussed the potential impact of non-compliance on the part of the Company's third-party partners, including game developers, noting that "any legal liabilities of, or regulatory actions against, such third parties may affect our business activities and reputation and, in turn, [its] results of operations." The Company further claimed to maintain adequate security measures to ensure compliance with applicable laws and regulations by its third-party partners, including by "provid[ing] their licenses, permits or filing documents relating to the relevant online games before entering into cooperation arrangements with them[.]" .

29.    The 2014 20-F also provided the follow table and descriptions for its "Core Applications":

| Name | Operating System | Date of Launch or Acquisition | Google Play Rating on December 31, 2014 | Number of languages available as of December 31, 2014 |
| --- | --- | --- | --- | --- |
| Clean Master | Android | September 2012(L) | 4.7 | 33 |
| CM Security | Android | January 2014(L) | 4.7 | 26 |
| Battery Doctor | Android iOS | September 2011(L) July 2011(L) | 4.5 | 27 |
| Cheetah | Windows | June 2012(L) | 4.6 | 25 |

| Browser / CM Browser* | | | | |
|---|---|---|---|---|
| | Android | June 2013(L) | | |
| | iOS | June 2013(L) | | |
| CM Launcher | Android | December 2014(L) | 4.6 | 22 |

*    *    *

L:      date of launch; A: date of acquisition.

* CM Browser was officially launched in June 2014.

### *Clean Master*

Clean Master is a junk file cleaning, memory boosting and privacy protection tool we launched in September 2012 for mobile devices. Clean Master also features application management functions. Clean Master was the No. 1 application in the Tools category on Google Play by worldwide monthly downloads in December 2014, according to App Annie.

Clean Master utilizes our cloud-based application behavior library to identify junk files associated with the applications installed on users' end devices. Our data analytics engine can also identify junk files generated by unknown applications, which allow Clean Master to effectively clean these junk files.

As our cloud-based data analytics engines continue to evolve, Clean Master becomes more precise in identifying and cleaning junk files.

### *CM Security*

CM Security, which we launched in January 2014 on the Android platform, is an anti-virus and security application for mobile devices. It also features junk file cleanup and unwanted call blocking functions. CM Security was the No. 2 application in the Tools category on Google Play by worldwide monthly downloads in December 2014, according to App Annie.

Powered by the dual-mode local and cloud-based application behavior library and our security threats library, CM Security is able to efficiently identify junk files and threats installed on users' mobile devices. Our data analytics engines also enable CM Security to identify threats not previously indexed in our application behavior and security threats libraries.

### *Battery Doctor*

Battery Doctor is a power optimization tool for mobile devices we launched in July 2011. Battery Doctor optimizes battery usage by utilizing our cloud-based application behavior library that contains power consumption characteristics of a number of mobile applications. Our data analytics engine can also identify power consumption characteristics of unknown applications, which allows Battery Doctor to effectively manage the power settings for these applications.

### *Cheetah Browser and CM Browser*

Cheetah Browser is our high speed, safe web browser available for both PCs and mobile devices. We launched the PC edition in June 2012 and the mobile edition in June 2013. Cheetah Browser PC edition is a dual-core web browser, integrating the functionality of both the Chromium open-source rendering engine and the Internet Explorer rendering engine. The integrated Internet Explorer rendering engine provides maximum compatibility with pages across the internet, while the Chromium browser kernel operates at higher speeds. Cheetah's intelligent core switching engine analyzes each web page visited and selects the fastest and most compatible rendering engine for that page.

CM Browser is a light and fast mobile browser that we officially launched in June 2014, targeting overseas markets. CM Browser can protect users from malicious threats without compromising browsing speed.

### *CM Launcher*

CM Launcher was launched in December 2014 on the Android platform, which is a secure launcher that offers acceleration, secure protection, stylish wallpapers, and it also automatically organizes mobile phones based on personal behavior. It is used to increase the startup speed of phones and boost their performance. Despite its light weight, CM Launcher enables apps to load quicker. Its anti-virus engine protects users' personal info and app data and block viruses and malware. CM Launcher automatically classifies users' apps into intelligent folders based on their habits, and recommends apps that are popular with the people in their neighborhood. In addition, it customizes users' unique wallpaper to fit their personal style.

30.     On April 22, 2016, the Company filed its annual report on Form 20-F for the period ended December 31, 2015 (the "2015 20-F"), which contained signed certifications pursuant to SOX by Defendants Fu and Yeung, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

31.    In the 2015 20-F, the Company reported total revenue of $568.7 million in 2015, approximately 88% of which it attributed to "online marketing services". The Company described its online marketing services business in the 2015 20-F, stating in relevant part:

We generate online marketing revenues primarily by providing mobile advertising services to advertisers worldwide, as well as referring user traffic and selling advertisements on our mobile and PC platforms. The fee arrangements generally include cost per click, cost per installation, cost per activation and cost per sale that originate from our platform, and cost per period. We believe that the most significant factors affecting revenues from online marketing include:

o   *User base and user engagement.* We believe a large, loyal and engaged user base would help us retain existing customers and attract more customers and business partners seeking online marketing services and at the same time gives us more pricing power. It also results in more user impressions, clicks, sales or other actions that generate more fees for performance-based marketing. In particular, a large and engaged mobile user base is crucial for the long-term growth of our online marketing services. We plan to introduce more products to increase our mobile users' engagement and amount of time spent on our products.

o   *Revenue sharing and fee arrangements with our significant customers.* A small number of customers have contributed a majority of our online marketing service revenues. Changes in the revenue sharing or fee arrangements with these significant customers may materially affect our online marketing services revenues. For example, changes from pay per click to pay per sale arrangements may result in a smaller percentage of revenue-generating traffic. Likewise, changes in the fee rate we receive per click or per sale may affect our online marketing services revenues. Although changes in the revenue sharing and fee arrangements with our individual customer may affect our revenues positively or negatively, our array of choices helps to increase our overall customer base and our ability to tailor fee arrangements to the needs of our customers.

o   *Ability to increase the number of advertisers engaging our online marketing services and business partners.* Advertisers purchase advertising services directly from us or through our partnering mobile advertising platforms. Our ability to increase the number of advertisers engaging our online marketing services depends on whether we can provide integrated marketing services and help the advertisers more precisely reach their targeted audience, the effectiveness of our direct sales efforts, our ability to successfully acquire additional customer base through acquisition of complementary businesses, and our ability to

increase our range of cooperation with our partnering mobile advertising networks, such as Facebook, Yahoo, Tencent and Google

o  *Optimal utilization of advertising inventory*. Certain categories of customers are willing to offer higher rates for our online marketing services due to the high return on investment they can achieve on our platform. Our ability to source high quality customers within the appropriate categories that our users are interested in and our ability to optimize the allocation of our advertising inventory to these customers can help improve our online marketing services revenues.

o  *Ability to provide targeted advertising*. We believe that data analytics is a key factor affecting our online marketing revenues. Data analytics enable us to map our users' interests and distribute targeted advertising to our users. Our ability to effectively conduct user profiling and provide targeted advertising affects advertising engagement and conversion, which affects our online marketing revenues.

32.    The Company acknowledged the importance of the Google Play store as a means of distribution for its apps, but presented merely a generic, boilerplate warning to the effect that "***[i]f Google Play . . . terminate[s] their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected***." (Emphasis added.)

33.    The 2015 20-F further discussed the potential impact of non-compliance on the part of the Company's third-party partners, including game developers, noting that "any legal liabilities of, or regulatory actions against, such third parties may affect our business activities and reputation and, in turn, [its] results of operations." The Company further claimed to maintain adequate security measures to ensure compliance with applicable laws and regulations by its third-party partners, including by "provid[ing] their licenses, permits or filing documents relating to the relevant online games before entering into cooperation arrangements with them[.]" .

34.     The Company acknowledged in the 2015 20-F that it "is subject to complex and evolving laws and regulations regarding privacy, [and] data protection[,] . . . which could result in claims, changes to [its] business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm [its] business."

35.     On April 26, 2017, the Company filed its annual report on Form 20-F for the period ended December 31, 2016 (the "2016 20-F"), which contained signed certifications pursuant to SOX by Defendants Fu and Ng, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

36.     In the 2016 20-F, the Company reported total revenue of $657.5 million in 2016, approximately 86% of which it attributed to "online marketing services". The Company described its online marketing services business in the 2016 20-F, stating in relevant part:

> We generate online marketing revenues primarily by providing mobile advertising services to advertisers worldwide, as well as referring user traffic and selling advertisements on our mobile and PC platforms. We charge fees for our online marketing services generally based on three general pricing models, which include cost over a time period, cost for performance basis and cost per impression basis. Cost for performance basis refers to, among others, cost per click, cost per installation, cost per activation and cost per sale that originate from our platform, while cost per impression refers to cost based on the number of impressions over a period. We believe that the most significant factors affecting revenues from online marketing include:
>
> o   *User base and user engagement*. We believe a large, loyal and engaged user base would help us retain existing customers and attract more customers and business partners seeking online marketing services and at the same time gives us more pricing power. It also results in more user impressions, clicks, installations, or other actions that generate more fees for performance-based marketing. In particular, a large and engaged mobile user base is crucial for the long-term growth of our online marketing services. We plan to further improve our products and introduce more products to increase our mobile users' engagement and amount of time spent on our products.

o *Revenue sharing and fee arrangements with our significant customers*. A small number of customers have contributed a majority of our online marketing service revenues. Changes in the revenue sharing or fee arrangements with these significant customers may materially affect our online marketing services revenues. For example, changes from pay per click to pay per sale arrangements may result in a smaller percentage of revenue-generating traffic. Likewise, changes in the fee rates we receive per click or per sale may affect our online marketing services revenues. Although changes in the revenue sharing and fee arrangements with individual customers may affect our revenues positively or negatively, our array of choices helps to increase our overall customer base and our ability to tailor fee arrangements to the needs of our customers.

o *Ability to increase the number of advertisers engaging our online marketing services and business partners*. Advertisers purchase advertising services directly from us or through our partnering mobile advertising platforms. Our ability to increase the number of advertisers engaging our online marketing services depends on whether we can provide integrated marketing services and help the advertisers more precisely reach their targeted audience, the effectiveness of our direct sales efforts, our ability to successfully acquire additional customer base through acquisition of complementary businesses, and our ability to increase our range of cooperation with our partnering mobile advertising networks, such as Facebook, Google ,Yahoo, Baidu and Tencent.

o *Optimal utilization of advertising inventory*. Certain categories of customers are willing to offer higher rates for our online marketing services due to the high return on investment they can achieve on our platform. Our ability to source high quality customers within the appropriate categories that our users are interested in and our ability to optimize the allocation of our advertising inventory to these customers can help improve our online marketing services revenues.

o *Ability to provide targeted advertising*. We believe that data analytics is a key factor affecting our online marketing revenues. Data analytics enable us to map our users' interests and distribute targeted advertising to our users. Our ability to effectively conduct user profiling and provide targeted advertising affects advertising engagement and conversion, which affects our online marketing revenues.

o *International expansion*. As we continue to pursue a strategy to expand outside China, our online marketing revenues are increasingly affected by our ability to grow our user base and increase user engagement and monetization internationally. The challenges in increasing our online marketing revenue internationally include, among others, local competition, differences in advertiser demand, differences in the online

marketing practices and conventions, and differences in user and
advertiser reception and perception of our applications internationally.

37.    The Company acknowledged the importance of the Google Play store as a means
of distribution for its apps, but presented merely a generic, boilerplate warning to the effect that
"*[i]f Google Play . . . terminate[s] their existing relationship with us, our business, financial
condition and results of operations may be materially and adversely affected*." (Emphasis
added.)

38.    The 2016 20-F further discussed the potential impact of non-compliance on the
part of the Company's third-party partners, including game developers, noting that "any legal
liabilities of, or regulatory actions against, such third parties may affect our business activities
and reputation and, in turn, [its] results of operations." The Company further claimed to
maintain adequate security measures to ensure compliance with applicable laws and regulations
by its third-party partners, including by "provid[ing] their licenses, permits or filing documents
relating to the relevant online games before entering into cooperation arrangements with
them[.]" .

39.    The Company acknowledged in the 2016 20-F that it "is subject to complex and
evolving laws and regulations regarding privacy, [and] data protection[,] . . . which could result
in claims, changes to [its] business practices, monetary penalties, increased cost of operations,
or declines in user growth or engagement, or otherwise harm [its] business."

40.    On April 24, 2018, the Company filed its annual report on Form 20-F for the
period ended December 31, 2017 (the "2017 20-F"), which contained signed certifications
pursuant to SOX by Defendants Fu and Jiang, attesting to the accuracy of financial reporting,
the disclosure of any material changes to the Company's internal controls over financial
reporting, and the disclosure of all fraud.

{00305057;2 }

15

41.    In the 2017 20-F, the Company reported total revenue of $764.6 million in 2017, approximately 69% of which is attributable to "utility products and related services".[1] The Company describes its utility products and related services business in the 2017 20-F, stating in relevant part:

> Revenues from utility products and related services accounted for 91.8%, 84.8%, and 69.1% of our revenues in 2015, 2016 and 2017, respectively. Our portfolio of utility products has attracted a massive user base, which enabled us to provide mobile advertising services to advertisers worldwide, as well as refer user traffic and sell advertisements on our mobile and PC platforms. We charge fees for our online marketing services generally based on three general pricing models, which include cost over a time period, cost for performance basis and cost per impression basis. Cost for performance basis refers to, among others, cost per click, cost per installation, cost per activation and cost per sale that originate from our platform, while cost per impression refers to cost based on the number of impressions over a period. We believe that the most significant factors affecting revenues from online marketing include:

> *User base and user engagement in key markets.* We believe a large, loyal and engaged user base in key markets would help us retain existing customers and attract more customers and business partners for our utility products and related services business and at the same time gives us more pricing power. It also results in more user impressions, clicks, installations, or other actions that generate more fees for performance-based marketing. In particular, a large and engaged mobile user base is crucial for the sustainability of our utility product and related services. We plan to further improve our products and introduce more products to increase our mobile users' engagement with our products.

> *Fee arrangements with our significant customers.* A small number of advertising platform customers have contributed a significant portion of revenues for our utility products and related services business. In overseas markets, advertising platforms provide bids to us for displaying advertisements on our apps, and the bid prices we receive may fluctuate significantly depending on who are the bidders, the type of our advertising inventories, seasonality, and supply and demand balance. In domestic market, we have revenue sharing arrangements with advertising platforms, and the portion of revenue we receive from these customers is also subject to fluctuation due to similar factors. The fee arrangements with these significant customers and the mix of these arrangements

---

[1] Beginning in the 2017 20-F, the Company ceased disclosing its revenue for "online marketing services", replacing it with the income statement line item of "utility products and related services."

can have a significant impact on our revenues, and some of these impact may be beyond our control.

*Ability to provide targeted advertising.* We believe that data analytics is a key factor affecting our online marketing revenues. Data analytics enable us to map our users' interests and distribute targeted advertising to our users. Our ability to effectively conduct user profiling and provide targeted advertising affects advertising engagement and conversion, which affects our online marketing revenues.

*Development of online advertising industries in emerging markets.* We have a large user base for our mobile utility products in emerging markets such as India and some countries in south eastern Asia. Currently, the majority of advertising budgets in these markets are still spent in traditional media such as TV and newspaper and the online advertising industries in these emerging markets are still in their early stages of development. We expect that we can benefit from the growth of the online advertising industries in these markets as internet and smartphones gain deeper market penetration.

42.    The Company also reported in the 2017 20-F that "[i]n 2015, 2016 and 2017, [its] five largest customers in aggregate contributed approximately 57.7%, 47.9% and 44.7% of [its] revenues, respectively. Google became [the Company's] largest customer in 2017, and contributed 15.2% of [its] total revenues, compared to 6.3% in 2016."

43.    The 2017 20-F further discussed the potential impact of non-compliance on the part of the Company's third-party partners, including game developers, noting that "any legal liabilities of, or regulatory actions against, such third parties may affect our business activities and reputation and, in turn, [its] results of operations." The Company further claimed to maintain adequate security measures to ensure compliance with applicable laws and regulations by its third-party partners, including by "provid[ing] their licenses, permits or filing documents relating to the relevant online games before entering into cooperation arrangements with them[.]" .

44.    Relatedly, the Company acknowledged that it "is subject to complex and evolving laws and regulations regarding privacy, [and] data protection[,]…which could result

in claims, changes to [its] business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm [its] business."

45.     The Company acknowledged the importance of the Google Play store as a means of distribution for its apps, but presented merely a generic, boilerplate warning to the effect that "*[i]f Google Play . . . terminate[s] their existing relationship with us, our business, financial condition and results of operations may be materially and adversely affected*." (Emphasis added.)

46.     The Company also reported in the 2017 20-F that one of its newest apps, Cheetah Keyboard, "was launched in December 2016 on the Android platform and is an artificial intelligence-enabled application."  In the 2017 20-F, the Company specifically touted that Cheetah Keyboard "was featured four times by Google Play on its global homepage in the second half of 2017."

47.     The statements referenced in ¶¶ 25-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cheetah's apps had undisclosed imbedded features which tracked when users downloaded new apps; (ii) Cheetah used this data to inappropriately claim credit for having caused the downloads; (iii) the foregoing features, when discovered, would foreseeably subject the Company's apps to removal from the Google Play store; (iv) accordingly, Cheetah's Class Period revenues were in part the product of improper conduct and thus unsustainable; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

48.     On November 26, 2018, *BuzzFeed News* published an article reporting that certain Cheetah apps then available in the Google Play store were found to be exploiting user permissions as part of an ad fraud scheme. The *BuzzFeed News* article stated that Cheetah's apps "tracked when users downloaded new apps and used this data to inappropriately claim credit for having caused the download."

49.     According to the article, the scheme exploited the mechanism used by app developers to pay its partners to generate new downloads.  App developers often pay a fee that typically ranges from 50 cents to $3 to partners each time a user clicks on an ad for an app and then installs and opens it. Central to this payment structure is the accurate attribution of advertisers driving the installations

50.     However, as the article reported, precise app installation attribution is difficult: "To attribute the installation to the correct party, information about the device used to click on the ad and the network and publisher that served it is passed along with the app installation. When the app is finally opened, the app does a 'lookback' to see where the last click came from and attribute the installation accordingly."

51.     The *BuzzFeed News* article reported that Cheetah embedded a feature in certain of its apps to ensure that Cheetah was awarded the "last click" each time another app was download on the same device, regardless of whether Cheetah had any role in the download in question. The article further reported that Cheetah programmed its apps to launch the newly downloaded app without the user's knowledge following its download, which further increases the odds that Cheetah will receive credit for the app install, as the fee is only paid when a user opens a new app.

52.    The Cheetah apps exposed by the report include Clean Master (1 billion downloads), CM File Manager (65 million downloads), CM Launcher 3D (225 million downloads), Security Master (540 million downloads), Battery Doctor (200 million downloads), CM Locker (105 million downloads), and Cheetah Keyboard (105 million downloads). Several are among the most popular productivity apps in the entire Google Play store.

53.    Upon the publication of the article, certain of Cheetah's apps, including the Battery Doctor and CM Locker, were removed from the Google Play store.

54.    Following publication of the *BuzzFeed News* article, Cheetah's ADR price fell $3.32, or nearly 37%, over the next two trading sessions, closing at $5.48 on November 27, 2018.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cheetah securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cheetah securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by Cheetah or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used

in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Cheetah;

- whether the Individual Defendants caused Cheetah to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Cheetah securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cheetah  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

Plaintiff and members of the Class purchased, acquired and/or sold Cheetah securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.    Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

65.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Cheetah securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cheetah securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cheetah securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cheetah finances and business prospects.

68.     By virtue of their positions at Cheetah , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Cheetah, the Individual Defendants had knowledge of the details of Cheetah internal affairs.

70.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Cheetah.  As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cheetah businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Cheetah securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Cheetah business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cheetah securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.    During the Class Period, Cheetah securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cheetah securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Cheetah securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Cheetah securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

74.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.    During the Class Period, the Individual Defendants participated in the operation and management of Cheetah, and conducted and participated, directly and indirectly, in the conduct of Cheetah business affairs.  Because of their senior positions, they knew the adverse non-public information about Cheetah misstatement of income and expenses and false financial statements.

76.    As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cheetah financial condition and results of operations, and to correct promptly any public statements issued by Cheetah which had become materially false or misleading.

77.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Cheetah disseminated in the marketplace during the Class Period concerning Cheetah results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cheetah to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Cheetah within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cheetah securities.

78.    Each of the Individual Defendants, therefore, acted as a controlling person of Cheetah. By reason of their senior management positions and/or being directors of Cheetah, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Cheetah to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Cheetah and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cheetah.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

{00305057;2 }

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  January 22, 2019                          Respectfully submitted,


                                                 **POMERANTZ LLP**

                                                 */s/ Jeremy A. Lieberman*
                                                 Jeremy A. Lieberman
                                                 J. Alexander Hood II
                                                 Jonathan D. Lindenfeld
                                                 600 Third Avenue, 20th Floor
                                                 New York, New York 10016
                                                 Telephone: (212) 661-1100
                                                 Facsimile: (212) 661-8665
                                                 Email: jalieberman@pomlaw.com
                                                 Email: ahood@pomlaw.com Email:
                                                 jlindenfeld@pomlaw.com

                                                 **POMERANTZ LLP**
                                                 Patrick V. Dahlstrom
                                                 10 South La Salle Street, Suite 3505
                                                 Chicago, Illinois 60603
                                                 Telephone:  (312) 377-1181
                                                 Facsimile:  (312) 377-1184
                                                 Email:  pdahlstrom@pomlaw.com

                                                 ***Attorneys for Plaintiff***